**OAK ADEC, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 507–86C, 594–86C and 728–86C.**

United States Claims Court.

Nov. 26, 1991.

Irwin Goldbloom, Washington, D.C., with whom were Roger S. Goldman, Washington, D.C., and Bradley L. Powell, Seattle, Wash., for plaintiff.

Randall J. Bramer, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Thomas W. Peterson, Washington, D.C., for defendant; Anthony Crouse and Douglas Hinds, San Bruno, Cal., of counsel.

## ORDER

BRUGGINK, Judge.

Pending is a motion by plaintiff Oak Adec, Inc. ("Oak Adec") for partial summary judgment on the issue of entitlement. Because genuine issues of material fact exist, Oak Adec's motion is denied.

## BACKGROUND

Oak Adec was under contract to install Energy Management and Control Systems ("EMCS") at three government military facilities. Oak Adec claims that the Government has admitted, in documents acquired through discovery, that the specifications for the EMCSs were defective and commercially impossible to perform. Based on this alleged admission by the Government, Oak Adec moves for partial summary judgment on the issue of entitlement.

A brief discussion of the systems at issue is in order. As a result of the energy crisis in the late 1970s, the Defense Department embarked upon a program to develop computer-driven "Energy Management and Control Systems," or EMCSs, to minimize energy usage in government buildings. The EMCSs are controlled by a central microcomputer connected to Field Interface Devices ("FiDs") located throughout the facility. The FiDs are remote, intelligent environmental monitors capable of adjusting the system in response to changes in humidity, temperature, etc. In an effort to control energy costs, the FiDs monitor energy demand and usage throughout the facility, and affect changes to the heat, ventilation and air conditioning ("HVAC") system as needed. Thus, the FiDs must have the capability to function independently of each other and the central computer. To achieve this independence, the FiDs must be equipped with processors that share many of the functions of the central computer. This function-sharing arrangement is known as "distributed processing."

The problems Oak Adec had centered around the development of the stand-alone FiDs. The parties dispute whether a stand-alone FiD could be produced using technology that existed in that time frame, but they generally agree that to develop a FiD from scratch would require a large programming effort. About two years after the original contract completion dates, Oak Adec delivered systems driven by software developed in-house by Oak Adec. These systems were eventually accepted by the Government. The Government asserts, however, that the systems were generally noncompliant with the contract specifications.

The FiD requirements in the Oak Adec contracts were taken from the 1978 Tri-Services Guide Specifications ("Guide Specs") drafted by the Naval Facilities Engineering Command ("NAVFAC") with input from the EMCS industry. Claiming that the Guide Specs were defective and commercially impracticable, Oak Adec filed suit seeking reimbursement of the excessive costs it incurred in performing its contracts. In its summary judgment motion, Oak Adec argues that the elements of its case are proved by evidence produced by the Government through discovery.

## DISCUSSION

 Several factors have been considered in evaluating a claim of commercial impossibility, including: 1) whether any other contractor was able to comply with the specifications;[1] 2) whether the specifications require performance beyond the state of the art;[2] 3) the extent of the contractor's efforts in meeting the specifications;[3] and 4) whether the contractor assumed the risk that the specifications might be defective.[4] After reviewing the parties' submissions, the court concludes that as to each of these factors, the evidence offered by the parties is conflicting. Summary judgment is thus precluded. Each of the factors is discussed below.

Oak Adec must prove that the industry as a whole found the specifications impossible. *Jennie–O Foods, Inc. v. United States*, 217 Ct.Cl. 314, 580 F.2d 400, 410 (1978); *Foster Wheeler*, 513 F.2d at 595. It contends that Government documents show that the entire EMCS industry was fraught with problems and wholly unable to comply with the specifications, thus proving the specifications were defective. As support for this contention, Oak Adec cites government memoranda, depositions of government personnel, and reports from Congressional hearings on energy policy, which state that a significant number of the EMCS contracts were behind schedule and over cost. There is no doubt that the EMCS program was the source of significant difficulties for the Government and contractors alike. The question is whether the widespread hardships faced by the industry require a finding that the Guide Specs were impossible to perform.

The Government, on the other hand, has proffered some evidence that other contractors have performed contracts that adhere to the specifications complained of by Oak Adec. The Government offers two types of evidence. It offers affidavits from Corps personnel and representatives of contractors, in which categorical, but general statements are made to the effect that the specifications were not impossible to perform, that other contractors completed identical or similar contracts, and that Oak Adec personnel made assurances that it could perform the work. In addition, the Government points to operational EMCSs delivered by HSQ Technology at the Puget Sound Naval Shipyard in 1980, by Advanced Electrical Applications at Travis Air Force Base in 1981, by Johnson Controls at the U.S. Army Carlisle Barracks in 1981, and by Williams Electric at Eglin Air Force Base in 1982. According to the Government's evidence, all of these contracts complied with the Guide Spec and were completed using technology available in 1978, the time frame in which Oak Adec alleges that such performance was impossible.

Oak Adec responds to this evidence by arguing that the systems developed by those contractors did not contain the stand-alone FiD requirement and were not completed on time. Oak Adec also relies on the failure of the Government to mention the allegedly successful contracts in its answer to one of Oak Adec's interrogatories. That interrogatory asked the Government to list all the contracts containing the stand-alone FiD requirement along with the original contract completion date and final acceptance date for each such contract. In its response to the interrogatory, the Government listed six projects that were completed on time, including the Puget Sound Project delivered by HSQ Technologies. At oral argument, counsel for the Government stated that the other projects cited above were inadvertently left off the list. While the court takes note of the inconsistencies in the Government's evidence, we are not free to discard it completely on that basis. If, regardless of the earlier answers to the interrogatories, it in fact appears that other contractors performed identical

---

1. *Foster Wheeler Corp. v. United States*, 206 Ct. Cl. 533, 546–47, 513 F.2d 588, 595 (1975).

2. *Dynalectron Corp. v. United States*, 207 Ct.Cl. 349, 518 F.2d 594, 601 (1975), citing *Foster Wheeler Corp. v. United States*, 206 Ct.Cl. 533, 513 F.2d 588 (1975).

3. *Whittaker, Power Servs. Div.*, 79–1 B.C.A. (CCH) ¶ 13,805 (A.S.B.C.A.1979).

4. *Foster Wheeler*, 513 F.2d at 598.

or even very similar projects, then the scant number of those projects, or their dissimilarity go to the weight of the Government's position. Since such evidence exists, the court declines to rule that, as a matter of law, no triable issue exists. We find that there exists a genuine issue of material fact as to whether the industry as a whole was unable to perform the stand-alone FiD portion of the specifications.

A second key issue raised by Oak Adec's claim is whether the specifications require performance beyond the state of the art. *Dynalectron,* 518 F.2d at 601. Oak Adec alleges that the Government has admitted that compliance with the stand-alone FiD component of the contract required performance beyond the state of the art. In support of this allegation, Oak Adec quotes from a report prepared for the Corp of Engineers by a private engineering firm which states:

> The EMCS Tri–Service Guide Specification of August, 1978, represents the state-of-the-art and an improvement from the previous guide specifications. The August, 1978, specification is the result of concerted efforts by many experts whose desire it was to apply the available EDP industry Distributed Processing concepts using state-of-the-art technology to achieve an economical and dependable EMCS for effective energy conservation.

Plaintiff's Motion For Partial Summary Judgment, March 19, 1991, at 8 (quoting Kling–Lindquist, Inc., Report on State–of–the–Art Technology Energy Monitoring and Control Systems 5–1 (rev. ed. May 1, 1979)). Oak Adec argues that this statement is an admission by the Government that the application of distributed processing concepts to EMCS "represented a new and untried advance of the state of the art." *Id.* It does not necessarily follow, however, that because a specification embraces state-of-the-art technology, that it thereby advances the state-of-the-art. Moreover, the evidence proffered by the Government on this point contradicts Oak Adec's interpretation of the above-quoted report. The Government's evidence, which for the purposes of this motion must be believed, shows that at the time the contract was awarded, ready-to-install hardware existed, as well as boilerplate-type software that could be customized to comply with each of Oak Adec's contract specifications for the FiDs. Rather than install the available technology, however, Oak Adec chose to write its own software from scratch. Clearly, a fact issue remains that must be decided largely on the basis of expert testimony.

A third factor to be considered is the extent of the contractor's effort. *Norair Eng'g Corp.,* 79–1 B.C.A. (CCH) ¶ 13,636 (A.S.B.C.A.1979) (more than "half-hearted" efforts are necessary to show commercial impossibility). The Government alleges that Oak Adec was not technically competent to undertake the mammoth programming task necessary to develop the software from the ground up, and that unwise management decisions were the true cause of the delays and added expense. The Court of Claims in *J.A. Maurer, Inc. v. United States,* 202 Ct.Cl. 813, 485 F.2d 588 (1973), considered subjective factors such as the mistaken business and technical judgment of the contractor, and held that they were the main cause of the contractor's difficulties. *J.A. Maurer,* 485 F.2d at 596.

Oak Adec strenuously disputes the relevance of this analysis. It asserts that impossibility is to be measured by an objective, rather than subjective, standard. Thus, allegations by the Government that Oak Adec was unable to perform are irrelevant. The correct test, according to Oak Adec, is whether the industry as a whole, and not just Oak Adec, could perform the specifications.

■ Oak Adec's interpretation of the law on this point is erroneous. The case law does support a requirement that the contractor demonstrate that the specifications were, from an objective point, incapable of performance. *Natus Corp. v. United States,* 178 Ct.Cl. 1, 10, 371 F.2d 450, 456 (1967); *ESB, Inc.,* 81–1 B.C.A. (CCH) ¶ 15,012 (A.S.B.C.A.1981). However, it is plain that this analysis evolved as an *addi-*

*tion* to an underlying demonstration of subjective impossibility (the contractor itself cannot do the work). The contractor must also show that no one else could perform. *See* Restatement (Second) of Contracts § 261 cmt. e (1981). Hence, the courts use an objective standard to prevent an incompetent or negligent contractor from recovering by simply alleging that it (subjectively) could not perform the work. As stated by the board in *ASC Sys. Corp.*, 78–1 B.C.A. (CCH) ¶ 13,119 (A.S.B.C.A.1978): "[p]erformance impossibility must be established on an objective basis, not subjectively. That is, the contractor may not rely solely upon his own inability to accomplish the specified task; he must also negate the possibility of performance by others...." *ASC Sys.*, 78–1 B.C.A. at 64,134. The objective standard is thus not intended to be a "sword" for plaintiffs alleging impossibility, but rather a "shield" to be used by defendants to deflect such charges by a contractor whose own inability was the cause of non-performance. The standard does not operate as Oak Adec contends to insulate the contractor from inquiry into its management of the contracts.

■ Any question that Oak Adec must demonstrate its own effort to perform was answered by the Court of Claims in *Jennie-O Foods*. There, the court stated:

The [commercial impracticability] doctrine may be utilized only when the promisor has exhausted all its alternatives, when in fact it is determined that all means of performance are commercially senseless. There can be little sympathy for contractors who seek refuge behind the label of commercial senselessness (impracticability) without proof that they have made an effort to obtain performance in an alternative fashion.

*Jennie-O Foods*, 217 Ct.Cl. at 328, 580 F.2d at 409 (citation omitted). It is thus clear that the subjective experience of the contractor is a factor that must be considered when determining whether a contract is commercially impossible.

Oak Adec asks the court to consider the issue of commercial impossibility in a vacuum—divorced from the actual circumstances of its performance. Applying Oak Adec's reasoning, causation is simply to be assumed. This the court declines to do. The Government has raised an issue of contractor mismanagement. The issue on summary judgment can thus be viewed, either as whether Oak Adec has, as part of its case in chief, shown a causal connection between the asserted impossibility and its own unsuccessful efforts to perform, or whether facts exist to support the Government's defense of mismanagement. In either case, summary judgment would be inappropriate.

As to the former point, Oak Adec has chosen not to put on such evidence. As to the latter, the Government claims that Oak Adec's misfortune with its contracts was the result of improper management of the project. Specifically, the Government's evidence shows that Oak Adec decided not to fully design the system before starting development of the software. This decision, according to government experts, was not wise. The "design" of a large programming project is analogous to the blueprints for a construction project. The development (the writing of the source code) depends heavily on the design, much like a house builder relies on his drawings. On a smaller project, the programmer(s) probably can develop the software without first designing the system, similar to the way a master carpenter can build a birdhouse from "plans in his head." But the government affidavits allege that the EMCS in this case was too large and complex a programming task to undertake absent a complete design. The Government's evidence also shows that the system had to be redesigned on several occasions, leading to development delays in incorporating the design modifications. Declaration of William P. Webster, July 14, 1991, at ¶ 7.

As further evidence of Oak Adec's inability or unwillingness to perform, the Government cites a May 9, 1983, memorandum by Oak Adec's parent company which states the parent is "concerned that the future of Oak Adec is questionable," and expresses an intention to "remove itself

from the energy management business as swiftly and gracefully as possible." Appendix to Defendant's Opposition to Plaintiff's Motion for Summary Judgment at 113. Such a move, argues the Government, amounts to a concession that Oak Adec was incapable of performing the contracts. Other Oak Adec memoranda sharply criticize the company's own performance and ability to comply with the Guide Specs. *Id.* at 143–45.

While Oak Adec acknowledges that the extent of its effort is a factor to be considered, it attempts to downplay the weight that factor should be given. Plaintiff argues that the case law demonstrates that subjective factors, such as workmanship and design choices are of "minimal relevance" to a claim of commercial impossibility. It cites *Whittaker, Power Servs. Div.,* 79–1 B.C.A. (CCH) ¶ 13,805 (A.S.B.C.A.1979), to support this argument. In *Whittaker,* the board, after extensive hearings, found the evidence of objective impossibility so overwhelming that it outweighed the relatively insignificant evidence of contractor incompetence. *Whittaker,* 79–1 B.C.A. at 67,695. Plaintiff argues that this weighing by the board indicates that subjective factors are to be afforded "minimal relevance" when determining whether specifications are commercially impossible. Even if its interpretation is correct, Oak Adec has not made the requisite showing to entitle it to summary judgment because "minimal relevance" does not equal irrelevance. Oak Adec's reliance on *Whittaker* is misplaced, however, because unlike the *Whittaker* board, this court is not yet in a position to weigh the evidence. Instead, the court must take as true the evidence proffered by the non-moving party. Because the evidence conflicts as to the extent of Oak Adec's effort, summary judgment is improper.

■ The fourth issue relates to whether the plaintiff assumed the risk of non-performance. In this connection, at oral argument, the Government contended that the Guide Spec was a performance specification, therefore Oak Adec assumed the risk of impossibility and is precluded from re-covery. The Government is correct that the case law does not support recovery for breach of the implied warranty of specifications when the specifications are of the performance, rather than design type. But that does not mean that Oak Adec's claim is barred. The Government's argument confuses the distinction between a claim of defective specifications and one of impossibility of performance. A claim of defective design specifications is founded on the implied warranty that design specifications, if followed, will lead to a successful product. No such warranty arises with respect to performance specifications. *J.A. Maurer,* 485 F.2d at 595. On the other hand, "[w]hen performance specifications are involved and the contractor is not constrained by Government-imposed design requirements, the contractor's basis for relief is impossibility or commercial impracticability." 2 Ralph C. Nash, Jr. & John Cibinic, Jr., Federal Procurement Law 1023 (3d ed. 1980). The appropriate consideration with respect to performance specifications is whether the plaintiff can demonstrate that the defendant should bear the risk that the specifications may be impossible to achieve.

■ In that regard, certain issues arise. One made relevant here is, which party drafted the specifications? The party that drafts specifications normally bears the risk that those specifications will be possible to perform, *J.A. Maurer,* 485 F.2d at 594–95, but a contractor's participation in the drafting of performance specifications can operate to shift the risk of impossibility to the contractor. *Bethlehem Corp. v. United States,* 199 Ct.Cl. 247, 462 F.2d 1400 (1972). In this case, the Government alleges that by assisting in the development and preparation of the Guide Spec, Oak Adec participated to such a degree in the drafting of the specifications that it assumed the risk of impossibility. The record reflects that in 1977, Adec, Inc., ("Adec") was a subsidiary of Foxboro Industries, Inc. The Government alleges that Adec received the first draft of the Guide Spec in December 1977, and in response to a solicitation for comments, represented to the Government that it was capable of building a system that would

comply with those specifications. Adec attended four industry fora held by the Government to discuss drafts of the Guide Spec. After each forum, the Guide Spec was revised, and copies of the latest draft were sent to the industry participants. Adec commented in writing on each of the proposed drafts, and was characterized by Government personnel as an active participant in the process.

Oak Adec's own statements seem to substantiate the Government's assessment of the degree of Oak Adec's participation. In 1981, Oak Industries, Inc. bought Adec from Foxboro, Inc., and changed the name to Oak Adec, the plaintiff in this case. Subsequently, Oak Industries' president, in a memo forwarded to the EMCS contracting officer, stated that "Oak/Adec personnel have been active in the development of the basic Guide Specification, procedures, and methods currently utilized throughout the industry."

A similar degree of contractor participation in the drafting of specifications occurred in *Bethlehem Corp. v. United States*, 199 Ct.Cl. 247, 462 F.2d 1400 (1972). In *Bethlehem*, the Government contacted several contractors, including the plaintiff, for consultation on the development of an environmental test chamber. *Bethlehem*, 199 Ct.Cl. at 250, 462 F.2d at 1401. During the course of the ensuing discussions, the plaintiff assured the Government that it was possible to build a test chamber meeting the Government's proposed specifications. *Id.* The court held that these assurances, coupled with the fact that the plaintiff was an expert in the field, constituted an assumption of the risk of impossibility. *Id.* 199 Ct.Cl. at 254, 462 F.2d at 1404. In support of its holding, the *Bethlehem* court reasoned:

> Acceptance of [the contractor's] argument would mean that though a purchaser makes his choice because of the attractiveness of a manufacturer's representation and will be bound by it, the manufacturer is free to express what are only aspirations and gamble on mere probabilities of fulfillment without any risk of liability. In the fields of developing technology, the manufacturer would thus enjoy a wide degree of latitude with respect to performance while holding an option to compel the buyer to pay if the gamble should pan out.

*Id.* at 255, 462 F.2d at 1404 (quoting *United States v. Wegematic Corp.*, 360 F.2d 674 (2d Cir.1966)).

The Government has thus raised a genuine issue of material fact by producing evidence tending to show that it relied on Oak Adec's representations that the Guide Specs were attainable. Oak Adec's rebuttals only go to the degree of the Government's reliance on its assurances and expertise. Such a response is insufficient to extinguish the factual dispute. For that reason also, summary judgment is precluded.

## CONCLUSION

For the reasons stated above, the plaintiff's motion for partial summary judgment raises issues of fact as to numerous elements of its case in chief and also with respect to potential defenses. Accordingly, the motion for partial summary judgment is denied. The suspension of discovery is lifted.