**MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 283–89C.

United States Court of Federal Claims.

Order of Aug. 7, 1996.

Reissued March 9, 1998.

Rudolph F. Pierce, Boston, MA, for plaintiff.

Agnes M. Brown, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

*Orders originally were filed on July 19, 1996 and August 7, 1996. They are being reissued for publication to provide background for the published decision of the Court of Appeals for the Federal Circuit reversing and remanding the case.

1. The government's disclaimer of any warranty for design errors bars a plaintiff from recovering damages for the breach of other provisions of a contract if the underlying harm is in fact attributable to defective plans and specifications. *See PRB Uniforms, Inc.*, 80-2 B.C.A. (CCH) ¶ 14,602, at 71,994, 1980 WL 2675 (A.S.B.C.A.1980) (the government's disclaimer of any warranty for the technical data in a supply contract barred the contractor from challenging his default termi-

***Order of August 7, 1996 \****

WEINSTEIN, Judge.

On July 19, 1996, the court granted defendant partial summary judgment on several claims. When the court convened on July 22 to try the remaining claims, however, plaintiff represented, as discussed below, that no claims remained to be tried. Based on this representation, defendant agreed that no trial was necessary. Accordingly, the court grants summary judgment for defendant. The terms of the July 19, 1996 order \* (attached as Appendix A) are incorporated by reference herein.

■ In addition to granting summary judgment to defendant on the claims that were the subject of change orders, the July 19 order granted partial summary judgment to defendant on the claims for the settlement of the White claim for delay damages based on design defects against which defendant failed to get insurance for plaintiff's benefit, as allegedly promised in the Cooperative Agreement, and for resulting attorneys' fees and other litigation expenses. Specifically, the court held that plaintiff's waiver of any government warranties for design defects in § 222(a) of the Cooperative Agreement barred plaintiff's claims for damages it allegedly suffered because defendant did not have plaintiff named as an "additional insured" on insurance policies taken out by architects and engineers (A–E) engaged by the government's A–E and the A–E's subcontractors, as was required by § 222(c), as well as plaintiff's claim for reimbursement of legal fees it allegedly incurred because of the lack of such insurance coverage.[1] The court also

nation on the grounds of impossibility of performance, where the purported reason for the impossibility was defective specifications) (citing *J.A. Maurer, Inc. v. United States*, 202 Ct.Cl. 813, 485 F.2d 588, 595 (1973)), *aff'd sub nom. Buxeda v. United States*, 29 Cont.Cas.Fed. (CCH) ¶ 82,-685, at 88,127, 1982 WL 36694 (Ct.Cl.1982) (same), *aff'd without op.*, 706 F.2d 319 (Fed.Cir. 1983). This conclusion was suggested by the earlier opinion in this case. *See Massachusetts Bay Transp. Auth. v. United States*, 21 Cl.Ct. 252, 263–64 (1990) (Rader, J.).

The requirement of § 222(a) also derives from the government's (or any agent's) lack of authority, independent of statute, to create contingent or indeterminate liabilities in excess of legislatively

held that, in any event, any damages resulting from design errors were consequential damages, and too remote and speculative (based on the breach in question, which was to make MBTA an "additional insured," to protect MBTA as an A–E, against *MBTA's* defective plans and specifications, not against the *A–E's* design errors [2]), to be awardable by this court as contract damages. *See Wells Fargo Bank v. United States,* 88 F.3d 1012, 1015–16 (Fed.Cir.1996) (citing *Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741 (1980); *Rocky Mountain Constr. Co. v. United States,* 218 Ct.Cl. 665, 1978 WL 8468 (1978); *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707 (1975); *William Green Constr. Co. v. United States,* 201 Ct. Cl. 616, 477 F.2d 930 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974)). The court limited the evidence to be heard regarding the terrazzo floors to the damages due to defendant's failure, if any, to seek the designers' correction of the design to the terrazzo floor. While the order did not expressly so state, it is evident that the conclusion regarding § 222(a) applies with equal force to plaintiff's claim for damages it allegedly suffered because defendant did not pursue its contractual remedies against the designers for errors in the design of the terrazzo floor, as plaintiff argued it was required to do by § 220(c). That is, § 222(a) also bars claims for damages caused by designer error that are based on plaintiff's reading of § 220(c).

The court planned to proceed to trial on (1) the claim for breach of § 222(c), *i.e.,* to decide what it would have cost to procure replacement insurance coverage, (2) that portion of the claim arising from the White delay claim that was not attributable to defective design documents (plaintiff had not specified how much of the claim was attributable to design errors), (3) that portion of the attorneys' fees and other litigation expenses incurred defending against that portion of the White delay claim; and (4) the claim for breach of § 220(c), the only available damages being the cost to correct the *design errors* in the design of the terrazzo floor, as opposed to the cost of correcting the *damages* caused by such design errors (as plaintiff argued). On the morning designated for the beginning of trial, however, plaintiff stated its view that the governing law would not allow it to recover the cost of replacement insurance, or the cost of correcting the errors in the design of the terrazzo floor, because plaintiff never in fact incurred those expenses. Plaintiff also clarified that its claims arising from the White delay claim and the resulting litigation costs related only to the portion of the White delay claim attributable to defective design. Based on these understandings, the parties agreed that the claims the court expected to try were legally or factually barred by the court's July 19 order.

The Clerk shall enter judgment in favor of defendant.

## APPENDIX A

### Order of July 19, 1996

Pursuant to Title VII of the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 851 *et seq.,* the Secretary of Transportation delegated to the Federal Railroad Administration (FRA) authority to implement the Northeast Corridor Improvement Project (NECIP) to improve rail facilities between Boston and Washington, D.C. Def.App. Ex. 2 at 1; Am. Comp. Ex. D at 1, Ex. E at 5.[3] Plaintiff Massachusetts Bay

---

appropriated amounts. This prohibition is contained in the Anti–Deficiency Act, 31 U.S.C. § 1341; *OPM v. Richmond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990), and derives from the Appropriations Clause of the Constitution.

Even in the absence of a disclaimer of warranties, there is no implied warranty of specifications that extends so far as to obligate the government to indemnify a contractor for third-party claims. *Hercules, Inc. v. United States,* 516 U.S. 417, 423–25, 116 S.Ct. 981, 986, 134 L.Ed.2d 47 (1996).

**2.** The government alleged that MBTA should have mitigated or protected itself by negotiating an indemnity and hold-harmless agreement with the A–Es, or purchasing special project insurance.

**3.** "Def.App." refers to exhibits in the appendix to defendant's summary judgment motion. "Pl. App." refers to the appendix to plaintiff's summary judgment motion. "Am. Comp." refers to the amended complaint. "Def. Opp.App." refers to the appendix to defendant's opposition to plaintiff's summary judgment motion. "Mot.

Transportation Authority (MBTA) owns South Station, a railroad station in Boston targeted for improvements under NECIP. Am. Comp. Ex. E at 7.

On September 8, 1983, FRA and MBTA entered into the Boston South Station Transportation Center Project Cooperative Construction Agreement ("Cooperative Agreement"), which provided for the construction of certain improvements to South Station in accordance with the plans and specifications FRA prepared under the Boston South Station Improvement Project Design Agreement ("Design Agreement"), and established the rights and responsibilities of the parties with respect to construction, funding, use, maintenance, and operation of the improvements. Def.App. Ex. 2 ¶ 3.

On the eve of trial, which commences on July 22, 1996, the parties have cross-moved for summary judgment. Oral argument was held on July 17, 1996.

*Change orders*

■ At that time, the court announced, as it has suggested earlier, that it was granting defendant's motion for judgment that the plaintiff's claims for the costs of building a temporary trackhead structure and walkway, of sprinkler system work, of work on the entrance and exit areas of the headhouse, and of the headhouse floors were barred because plaintiff signed change orders in which it agreed to pay the costs claimed.

Section 216(c) of the Cooperative Agreement provided, "Documentation of MBTA-proposed changes shall be furnished directly to FRA, whether or not FRA approval is required. If FRA fails to disapprove an MBTA-proposed change or to request more information ... within fifteen (15) working days of receipt, FRA shall be deemed to have approved such change." Pursuant to § 216(d), each proposed change was to "be accompanied by a proposed allocation of the change's cost among funding categories.

Each party shall have the right to disapprove a proposed change unless and until the parties agree on the cost allocation of the proposed change."

On January 3, 1985, FRA complained that MBTA was not adhering to the change order process, and requested that it do so in the future. Def.App. Ex. 4 at 2. Among other points, the letter stated,

> FRA requires more information concerning change orders than is currently being provided.... Most importantly, FRA needs to know for each change what MBTA's proposed funding source is. That means FRA needs to know if the change is to be funded 100 percent FRA, cost-shared MBTA/FRA, 100 percent Local[,] or some combination of these.

*Id.* FRA suggested that MBTA add a line to its change order request form where it could indicate who was to pay for the proposed change. Def.App. Ex. 4 at 4, 11. The line was incorporated into subsequent change order request forms. *See, e.g.,* Def.App. Ex. 3 at 1.

MBTA's project manager stated in a declaration that the change order forms were used only "to determine who w[ould] initially pay for the work to be performed. Both the MBTA and the FRA have, however, reserved their right to seek reimbursement from each other for expenditures outlayed for change orders." Surrep. Mot. Dis.App. at 3; *see also* Pl.App. at 555. He also stated, however, that change orders in excess of $50,000 required approval by the MBTA Board of Directors, and that the change order form would be submitted to the board "so that [it], in making an informed decision as to whether to approve a change order, [would be] aware of whether the FRA w[ould] be sharing in the costs of the change...." Pl.App. at 556.

Change order request 47, dated September 3, 1985, proposed replacing the headhouse floors, with the $3,100,000 cost to be shared between the parties. Def.App. Ex. 3 at 1.

Dis." refers to defendant's September 14, 1989 motion to dismiss. "Opp. Mot. Dis." refers to plaintiff's December 11, 1989 opposition to defendant's motion to dismiss. "Rep. Mot. Dis." refers to defendant's February 9, 1990 reply to plaintiff's opposition to defendant's motion to dismiss "Surrep. Mot. Dis." refers to plaintiff's March 19, 1990 surreply to defendant's reply to plaintiff's opposition to defendant's motion to dismiss. "Am. Mot. to Revise" refers to plaintiff's amended motion to revise the court's July 31, 1990 opinion, filed September 1, 1995.

FRA requested additional information on the cost allocation. *Id.* MBTA revised the proposal on September 14, 1988 to provide that FRA would pay $434,000 and MBTA would pay $2,666,000. Def.App. Ex. 3 at 2. FRA approved the change order the same day. *Id.*

Change order request 55, dated May 7, 1986, proposed upgrading the sprinkler system from what was shown in the project documents, with MBTA to pay the entire $236,106.20. Rep. Mot. Dis.App. at 8. FRA approved the change order on May 20. *Id.*

Change order request 87, dated January 9, 1987, proposed installing different doors at the headhouse entrances and exits from what was shown in the project documents, with MBTA to pay the entire $257,929.06. Rep. Mot. Dis.App. at 10. FRA approved the change order on April 13. *Id.*

Change order request 89, dated January 27, 1987, proposed constructing a temporary passageway so the station could be used while certain track work was performed, with MBTA to pay the entire $250,000. Rep. Mot. Dis.App. at 12. FRA approved the change order on February 25. *Id.* Change order request 124, dated November 19, 1987, proposed modifying the passageway to extend its useful life, with MBTA to pay the entire $318,279.97, Rep. Mot. Dis.App. at 14, but with a note saying MBTA would seek "[r]eimbursement of the cost ... as the Authority pursues the resolution of [the White delay] claim with the Federal Railroad Administration," Rep. Mot. Dis.App. at 15. On February 4, 1988, FRA returned the change order request unsigned, stating that the cost was excessive, and adding,

> We also note that the source of funding is listed as "100% MBTA." This being the case, we would normally approve the change order, were it not for the statement [that reimbursement would be sought] ... [¶] I am therefore returning Change Order Request # 124 unsigned lest my signature

be misconstrued to imply FRA's admission of future liability.

Rep. Mot. Dis.App. at 16–17.

MBTA now contends that, under the Cooperative Agreement, FRA was supposed to pay for each of these items, and that the parties never agreed to any cost allocation, Pl.App. at 555, 557, 559, 561. Defendant argues that MBTA agreed in the change orders to pay for them itself, and cannot now change the cost allocation. The court agrees with defendant. Plaintiff's interpretation of section 216 comports with neither the parties' contemporaneous understanding of the provision, which is given considerable weight, *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1058 (Fed.Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983), nor the plain language of the agreement. *See also* § 106 Notices. To allow the cost allocation to be disputed after the fact would nullify the parties' right under section 216(d) to hold up a change until the allocation was settled. The court will not read section 216(d) as providing a meaningless right. *Fortec Constructors v. U.S.,* 760 F.2d 1288, 1292 (Fed.Cir.1985). That MBTA's directors may have decided, after FRA approved the change order, to disapprove its authorized agent's change order does not make MBTA's proposed cost allocation any less binding for changes that were performed. Therefore, the court deems conclusive the cost allocations set forth in the change orders.

The court grants defendant summary judgment on the claims involving these change orders.

*Section 222(c)*

In addition to granting summary judgment on the claims covered by the change orders, the court wishes to advise the parties prior to trial, in order to limit unnecessary trial testimony, that it is granting summary judgment to defendant on another issue, the question of whether defendant's admitted failure to obtain the insurance endorsements on the architect-engineer policies, as required by § 222(c) of the Cooperative Agreement,[4]

---

4. Section 222(c) of the Cooperative Agreement provided,

FRA shall secure from each of its consultant architect-engineers ... an endorsement to the benefit of the MBTA on the professional liability insurance policy or policies carried by such A/E[ ]s with respect to any A/E errors, omissions, or acts of negligence in the design of the Facility. FRA shall furnish the MBTA evidence of such endorsements.

makes defendant liable for any design errors in the plans and specifications, and consequently for any delay experienced by MBTA's contractor, J.F. White Contracting Co. ("White"), as a result of such design errors (as well as for its attorney's fees and litigation expenses in defending a claim brought against it by White based (in part) on such errors). Thus, plaintiff claims the costs of settling the White delay claim ($1.9 million), $791,000 in released claims, and $1,973,000 in attorneys' fees and other litigation expenses.

The court concludes that plaintiff's construction of § 222(c) impermissibly negates the clear terms of § 222(a), a broader provision that expressly put plaintiff on notice that FRA would *not* be responsible for design errors:

> Title to the Project Design Documents shall pass to MBTA upon acceptance by MBTA. MBTA acknowledges that the Project Design Documents are being prepared by an A–E acting as a contractor to FRA, not as FRA's agent. *FRA makes no warranties, express or implied, concerning the Project Design Documents.* No FRA or MBTA approval given under this Agreement shall be construed as a warranty of any kind. (Emphasis added.)

Also, the delay costs of White, and other damages associated with design errors, are too remote, speculative, and consequential to be compensable as damages by this court. *See Wells Fargo Bank v. United States,* 88 F.3d 1012, 1023 (citing, *inter alia, Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741 (1980) (Court of Claims refused to award damages to a company that, as a result of government wrongdoing, lost its bonding capacity)). Therefore, the court grants summary judgment to the government that MBTA cannot recover the amounts paid to settle the White delay claim or the expenses incurred defending against the claim.

At most, MBTA can recover what it would have cost MBTA to secure the insurance coverage that it alleges FRA should have provided pursuant to § 222(c). Therefore, the court will entertain testimony on the question of mitigation of damages: whether plaintiff knew that the endorsements had not been obtained; whether, if so, it timely attempted to mitigate by obtaining replacement insurance coverage; whether, as plaintiff now contends, such coverage was unavailable; and what such coverage would have cost at the point plaintiff should have sought to mitigate.

In addition, the court will entertain testimony on the issue of whether plaintiff waived its rights to enforce § 222(c) or to receive damages for its breach by failing to resort to the disputes resolution procedures of Article VI (including § 603, permitting voluntary termination), by failing to obtain insurance endorsements for FRA on the White policy, *see* § 222(b), or by acting inconsistently with an interest to insist upon strict performance of § 222(c).

*Section 220(c)*

Plaintiff's evidence regarding the terrazzo floors issue shall be limited to evidence premised on a proper reading of § 220(c), as providing for MBTA to pursue its rights relating to "*correction* of errors" etc., not to *damages* for errors.